SANDRA GOLDMAN vs. PETER L. GOLDMAN.

No. 88-P-744.

Hampden. October 12, 1989. January 19, 1990. - May 24, 1990.

Present: WARNER, C.J., DREBEN, & KASS, JJ.

*Divorce and Separation*, Division of property, Alimony.

In a divorce action, where the amount of the award of alimony to the wife and the limited duration of the award were not consistent with the judge's findings as to the husband's substantial income and the parties' life-style, the case was remanded for specific and detailed findings with respect to a new award of alimony. [608-612]

In a divorce action there was no significant error in the judge's valuation of marital assets and in his equitable division of that property. [613]

COMPLAINT for divorce filed in the Hampden Division of the Probate and Family Court Department on January 24, 1986.

The case was heard by *Joseph E. Rodgers*, J.

*Peter Roth* (*Ellen M. Randle* with him) for Sandra Goldman.

*William A. Godfrey* for Peter L. Goldman.

DREBEN, J. In this divorce proceeding involving the break-up of a marriage of twenty years, a probate judge ordered the husband to pay alimony to the wife in the amount of $700 a week for a period of eight years.[1] Because this court concluded that the rationale for the alimony portion of the judgment did not appear "either explicitly or by clear implication," *Bowring* v. *Reid*, 399 Mass. 265, 268 (1987), the

---

[1]The judge also ordered the husband to pay child support of $300 per week for the son of the parties, to keep in force his existing medical and hospitalization insurance for the wife and children, and to pay "all reasonable and necessary medical and dental expenses incurred for said minors and not covered by insurance."

matter was remanded to the probate judge.[2] In particular, we stated that the findings: (1) do not discuss the "wife's needs for support measured by the parties' 'station'" (the husband's annual income exceeded $478,000, not including substantial contributions to his pension plan), see *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985), and (2) "do not explain why, after this long-term marriage, alimony is limited to eight years." The probate judge has now filed a supplementary memorandum. Neither his original findings nor his response, however, supports the amount of the alimony award or its limited duration.

In addition to challenging the provision for alimony, the wife claims error in the judge's valuation of marital assets and in their division. Although we might have accorded different weight to some of the evidence, we conclude that the findings as to value are not clearly erroneous and that the equitable division which gave the husband somewhat more than fifty-two percent of the marital assets[3] falls within the area of discretion of the trial judge. We reverse the portion of the judgment relating to alimony and remand for an award commensurate with the economic circumstances of the parties, such alimony to continue until there is a material change in those circumstances. See *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 624 (1986).

We relate the relevant facts as found by the judge, supplemented interstitially by uncontested evidence. Dr. and Mrs. Goldman were married on February 15, 1967, and have resided in Massachusetts since 1974. At the time of the hearing, they had been married for twenty years. Mrs. Goldman was forty-six years old and Dr. Goldman forty-eight. They have two children, a daughter, born on June 30, 1970, who lives with her father, and a son, born on November 4, 1971, who lives with his mother.

---

[2] Our remand order was issued on October 16, 1989; the judge's memorandum was received by this court on December 18, 1989, and the parties were permitted to respond to the judge's memorandum. They did so on or before January 19, 1990.

[3] This percentage takes into account the liabilities of the parties found by the judge.

Marital difficulties began when the parties moved to Springfield in 1974. Mrs. Goldman found it hard to adjust to a new community, and Dr. Goldman was unhappy in his association with a surgical group. Described by the judge as "somewhat authoritarian and intolerant of behavior he view[ed] below his standards," Dr. Goldman was a workaholic who rarely had time to relax or be at home for any length of time. By his own admission, his work came before his children. Mrs. Goldman, on the other hand, was permissive. She was not interested in his career and rarely entertained.

"The parties would get into wild and verbal arguments when Mrs. Goldman would be demeaned and degraded due to her lifestyle and careless spending, as well as the lack of discipline for the children. . . . Dr. Goldman assigned to her the job of supervision of the children during the day as well as their school studies while he worked." Characterizing Mrs. Goldman's performance in this "assignment" as a "failure," the judge found that Dr. Goldman's reactions were "immature and stupid." If Mrs. Goldman countermanded his directions to the children, "the war was on." Dr. Goldman became frustrated and angry, and responded "verbally and physically" to his wife. He also chopped up his son's bike and destroyed his skis.

Financially, Dr. Goldman, a neurosurgeon, is most successful. His medical practice "continues to demonstrate substantial and increasing profits each year. His practice and reputation continues to grow and will continue to grow if his health holds out." His income from all sources for the tax year 1986 was $478,560, including a $60,650 bonus from his professional corporation, but not including a contribution of approximately $69,204 paid to his pension plan by that corporation. Because his pension plan was fully funded at the time of the hearing, the money which historically has been paid into the pension plan will probably be available to him as a direct distribution of earnings in the form of increased salary or bonus. The corporation pays many of his personal expenses such as contributions and medical and travel ex-

penses,[4] and may pay him bonuses at any time of the year at his discretion.

Mrs. Goldman's only source of income at the time of the hearing was child support and alimony payments. Since the parties' separation, she has received $1,000 a week and indirect payments for household and medical expenses. The direct and indirect payments totaled $1,600 per week or $83,200 a year. She has not worked since before the birth of her children. She was a registered nurse, is currently unlicensed and must upgrade her skills. "[T]his could be 'on the job training.' " She applied for a job as a nurse and was offered a full-time position which she refused as she only wanted to work part-time. "She has an earning capacity of $25,000 to $30,000 a year if she desires it."

The parties did not accumulate substantial liquid assets during the marriage because of their "elaborate spending habits." They enjoyed a high life-style due to the earnings of Dr. Goldman and "lived up to the limit of his earnings." Mrs. Goldman had unlimited access to write checks on their joint checking account which the judge found "she exercised . . . with little or no restraint."

The judge determined that the total assets of the parties were $1,410,558 and that there were liabilities of $140,306. A summary of the judge's separate orders reveals the following division of assets:

*Mrs. Goldman*

| | |
|---|---|
| Net equity in marital home | $335,597[5] |
| Half interest in Maine land | 8,750 |
| Furniture and furnishings | 55,865 |
| Jeep | 5,100 |
| Checking and savings accounts | 250 |
| Lump-sum payment | 216,000[6] |

---

[4]These payments were properly treated for tax purposes as distributions of earnings.

[5]Mrs. Goldman is to be responsible for the payment of an outstanding mortgage of $54,000.

[6]This figure takes no discount for the present value of these future payments.

|  |  |
| --- | --- |
| (payable $100,000 within ninety days, and thereafter "$20,000 a year for a period of five (5) years and a final payment of $16,000 in year (6) at 6.5% interest per annum, commencing one year from the final judgment") | |
| SUBTOTAL ............................. | $621,562 |
| LESS LIABILITIES ............................. | (13,001)[7] |
| TOTAL ............................... | $608,561 |

*Dr. Goldman*

|  |  |
| --- | --- |
| Net equity 38 School Street ............... (Dr. Goldman's office) | $225,500 |
| Half interest in Maine land................ | 8,750 |
| Personal property ........................ | 72,010 |
| Automobile (Ferrari) ..................... | 25,000 |
| Cash ...................................... | 22,696 |
| Cash value, life insurance ................. | 16,341 |
| Pension ................................... | 433,937 |
| East Coast Historical Assn................. (a real estate venture) | 72,013 |
| Baystate Neuosurgical & Neurological Group, Inc. ...................................... (Dr. Goldman's professional corporation) | 128,749 |
| SUBTOTAL ............................. | $1,004,996 |
| Less: Lump sum payment .................. (not discounted for present value) | (216,000) |
| LIABILITIES ............................. | (113,615) |
| TOTAL ............................... | $675,381 |

---

[7] The liabilities of the wife do not reflect $25,805 incurred for additional legal fees and for an expert the wife hired to appraise the husband's corporation. The judge disallowed the expert's fee. He ordered Dr. Goldman to pay $30,000 of the $38,626 he found owed by the wife as attorneys' fees. (The liability figures for each of the parties takes this sum into account.) It appears that the judge only looked at one affidavit of counsel. Had he taken into account the attorneys' fees owed by the wife at the end of the

In addition, as indicated earlier, the judge ordered the husband to pay the wife $700 a week as alimony for eight years and $300 a week as child support for their son until such time as he becomes emancipated.[8] This was a reduction of $600 a week. The temporary order had provided her with $1,000 a week in alimony and child support payments, but had also provided her with indirect benefits in the amount of $600.

1. *Amount of alimony award.* No explanation can be gleaned from either the judge's original findings or his supplemental memorandum for the low alimony figure. It is not consistent with the judge's findings as to Dr. Goldman's high income and his findings concerning the couple's previous elaborate life-style.[9] The judge rejected the parties' statements as to need as being "inflated and not realistic" and stated, "It is the Court's *feeling* that Mrs. Goldman's needs will be met by a payment of alimony and support of $1,000 per week . . . ." (emphasis supplied). In discussing the wife's needs in his supplemental memorandum, the judge stated:

> "It is incumbent upon the litigants to show by a preponderance of the evidence what the needs are, this they have failed to do. The mere fact that the Husband has the ability to pay does not, to my knowledge, dictate a corresponding need to receive an amount commensurate

---

trial, in accordance with counsel's second affidavit, the amount would have been $57,431 rather than $38,626. On remand, the judge should reexamine the award of attorneys' fees taking into account the second affidavit of counsel and any additional affidavit filed by counsel for fees for the appeal to this court.

[8]The judge noted that the husband was incurring substantial annual schooling and psychiatric expenses (in excess of $20,000) for his daughter, adding, "the Court is convinced that the doctor will afford the same educational opportunities to the son if he is ready constructively to use such an opportunity."

[9]The alimony award is approximately 7.6% of Dr. Goldman's 1986 pretax income. If, as seems likely, the amounts formerly paid toward his pension plan are paid directly to him, the amount is approximately 6.6% of his pre-tax income.

with such ability to pay.[10] It is incumbent upon a re-
cipient spouse, in fact it is an affirmative duty, to miti-
gate the burdens of support by utilizing his or her finan-
cial means and earnings potential or both.

"There is no law that assures every married woman the
right of a life of idleness. *Commonwealth* v. *Whiston*,
306 Mass. 65, 66 [1940]."

The judge then reiterated his finding that the wife's earning
capacity is in the range of $25,000 to $30,000 a year.

In his original findings, the judge found that all the income
and marital assets were due to Dr. Goldman's efforts. He
noted, however, that Mrs. Goldman had located the building
in which Dr. Goldman maintained his practice and that she
had supervised its renovations. Also, Mrs. Goldman had been
"assigned" the responsibility of caring for the home and the
children throughout the marriage. She arranged for their
schooling and their extracurricular activities, attended PTA
meetings, took the children to visit their grandparents, and
oversaw their religious education. "She was not very success-
ful in this endeavor, but Dr. Goldman must also share in this
failure."

In his supplementary memorandum, the judge pointed to
the fact that the marriage began to deteriorate in 1974 when
their life-style was unremarkable. "This marriage partner-
ship started its significant deterioration at about this time.
[Mrs. Goldman's] non-monetary contribution to the rearing
of the children and their care and supervision was a
disaster."

Finally, in discussing Mrs. Goldman's needs with regard to
her station, the judge, on remand, stated that these were ade-
quately met, and that it was not realistic for her to retain
and maintain the present eleven-room house with its attend-
ant expenses.

The judge's stress on the problems of the children to char-
acterize the wife's nonmonetary contribution as a "disaster"

---

[10]The judge also found, "Whatever the needs are, Dr. Goldman has the
necessary resources to fulfill these needs."

and "failure" is not a reason for a low alimony award. The contribution of a wife who is fully responsible for the home and children cannot be considered negative and discounted because the children have problems. This is not a case where there is evidence, or even a hint, of neglect or misfeasance on the part of Mrs. Goldman. One can only wonder at the notion that one parent can "assign" responsibility of children to the other, as did Dr. Goldman, and then, because the children are troubled, take as naught, or even negative, the "assignee's" contribution.

That the marriage began to deteriorate before the parties' life-style escalated is also no reason to limit alimony to the parties' earlier station. Unlike the situation in *Savides* v. *Savides*, 400 Mass. 250, 252 (1987), where it was uncontested that both parties had established separate relationships and had ceased to hold themselves out to the community as husband and wife, here, despite their difficulties, the parties clearly remained married.

Moreover, the emphasis on the wife's earning capacity based on full-time employment does not fit the circumstances. Not only has the wife not worked for eighteen years and must be retrained and relicensed, but, in view of the judge's findings, set forth in the margin,[11] concerning her

---

[11]"The parties' son, . . . began to exhibit similar problems in school, as had [the daughter]. He too was sent to a private school but continued not to do well. [The son] has continued to live with Mrs. Goldman in the marital residence. During the academic year 1986-1987 he attended . . . High School and was constantly absent or tardy. As a result, he failed all of his subjects. I find that Mrs. Goldman made efforts to attempt to get him to school, including involving school authorities and the police, but due to the personal problems [the son] was experiencing she was unable to succeed. This fall, [the son's] outlook has improved dramatically and he is doing well in school, although he also is repeating a grade. He currently is receiving three A's, one B and one C in his academic courses and an additional B in an elective course. He has been absent only one day (for a Jewish holiday) and although he has been tardy on a number of days, with one or two exceptions he has missed portions only of his home room period and not any class time. This year [the son] is currently taking music lessons twice a week and working part-time after school and on weekends. Dr. Goldman admitted during his testimony that he has not seen his son since early last spring and that he has not even sent him a birthday or holiday present since the separation."

son's school difficulties, and his recent dramatic progress, her refusal to take a full-time job and her wish to work only part-time while her son is at home is not unreasonable. In these circumstances, emphasis on the full-time earning capacity of the wife and penalizing her for making a decision to be at home is not appropriate. In any event, even if the judge's figures are accurate, and the wife could earn $30,000 a year, the evidence does not suggest, and the judge's findings do not support, the conclusion that her total income would be sufficient for her to maintain her previous mode of living. See *Gottsegen* v. *Gottsegen*, 397 Mass. at 623. That the judge might not have approved of the parties' life-style is irrelevant.

The evidence showed that Dr. Goldman continued to live his lavish life-style with trips to Africa and other elaborate expenditures, while Mrs. Goldman's economic condition deteriorated, even under the temporary order which, as indicated, provided $600 more a week in indirect benefits than did the final award.

As pointed out in *Gottsegen* v. *Gottsegen*, 397 Mass. at 623, the fundamental purpose of traditional alimony, namely, maintenance of a wife "according to the property and condition of her husband," *Coe* v. *Coe*, 313 Mass. 232, 236 (1943), was not changed by the passage of G. L. c. 208, § 34. Quoting from *Grubert* v. *Grubert*, 20 Mass. App. Ct. at 819, which in turn quoted *Partridge* v. *Partridge*, 14 Mass. App. Ct. 918, 919 (1982), the Supreme Judicial Court stated in *Gottsegen* at 623-624, "The focus of any financial award must include 'the crucial issue in an alimony dispute, namely, the [spouse's] need for support and maintenance in relationship to the respective financial circumstances of the parties.'" Absent good reason, in a long term marriage, there is no justification for the life-style of one spouse to go down while the other remains high.[12]

---

[12]Although the judge suggested that the wife sell the marital home, the record does not provide factual support that this is a viable suggestion. The wife is now forty-eight, and a sale will probably result in taxable gain. See I.R.C. §§ 121, 1034, 1041(b)(2) (1988). In addition, it is not clear that a

In sum, the award of alimony is not consistent with the judge's findings of Dr. Goldman's income and the parties' life-style. On remand, the judge may call for additional evidence, such as past expenditures of the wife, to show what amounts are required to allow her to maintain her previous station. Specific and detailed findings are to be made with respect to a new award of alimony which show consideration of the wife's needs in light of her station in life during the marriage.

2. *Duration of award.* There is also no adequate explanation of the limitation of the alimony to eight years. In the early 1970's, Dr. Goldman was in a serious automobile accident. He was left with several metallic screws and pins in his lower extremities, and he suffers from swelling and pain in his right ankle. In the spring of 1987, he underwent a lumbar disk operation, and his attending physician urged him to reduce his workload and not work in excess of forty hours a week.

Both in his original memorandum and in his response to our remand, the judge stated, "[O]ne would have to be hiding his head in the sand to feel that the serious injuries he has received will in no way affect his ability in the future, or that the hours he is presently putting in will continue without abatement." In his later memorandum the judge added, "Further, is it necessary or mandatory that he continue to work at his present pace so that he may maintain his wife at the present standard while she decides not to be gainfully employed?"

Dr. Goldman's earnings have, each year, shown "substantial and increasing profits" and "[h]is practice and reputation continues to grow." Neither the wife's earning capacity nor the speculation as to the husband's future earnings supports the limitation of alimony to eight years. The termination of alimony at that time does not "bear some relation to the financial circumstances of the parties." *Gottsegen* v.

suitable smaller shelter will cost her less, see *Grubert* v. *Grubert*, 20 Mass. App. Ct. at 818 n.14, or that such a move is in the interest of her son. See *Hartog* v. *Hartog*, 27 Mass. App. Ct. 124 (1989).

*Gottsegen*, 397 Mass. at 624. Where future events cannot be predicted with any measure of certainty, an alimony award should be based on present conditions. A complaint for modification based on a material change in circumstances is the means for dealing with future events.

3. *Equitable division.* We have examined the claims of the wife which relate to the equitable division, and, while there may be some question as to the valuation of some of the assets, even if there are some errors, we deem them insignificant. Cf. *Drapek* v. *Drapek*, 399 Mass. 240, 247 (1987). "Mathematical precision is not required of equitable division of property." *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 861 (1989). We reject the wife's most significant claim of error in valuation, the failure of the judge to allocate any amount to the goodwill of the husband's professional corporation. The judge was warranted in accepting the husband's accountant's opinion that there was no goodwill in this one-man professional corporation. For a discussion of the classification of professional goodwill, see generally Gregory, The Law of Equitable Distribution § 6.03 (1989).

4. *Conclusion.* The portion of the judgment as it relates to alimony is reversed, and the matter is remanded to the probate judge for a redetermination of alimony and attorneys' fees (see note 7, *supra*) consistent with this opinion. The wife is to have costs of this appeal. In all other respects, the judgment is affirmed.

*So ordered.*